**Pages 1 - 20**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

MEREDITH CALLAHAN, et al.,            )
                                      )
            Plaintiffs,                )
                                      )
   VS.                                 )    **NO. C 20-09203 EMC**
                                      )
PEOPLECONNECT, INC.,                   )
                                      )
            Defendant.                 )
                                      )

San Francisco, California
Thursday, May 13, 2021

**TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

**APPEARANCES VIA ZOOM**:

For Plaintiffs:
        MORGAN & MORGAN
        711 Van Ness Avenue - Suite 500
        San Francisco, California  94102
   BY: **MICHAEL F. RAM, ATTORNEY AT LAW**

        LAW OFFICE OF BENJAMIN R. OSBORN
        102 Bergen Street - Apt. 4
        Brooklyn, New York  11201
   BY: **BENJAMIN R. OSBORN, ATTORNEY AT LAW**

For Defendant:
        JENNER & BLOCK LLP
        353 North Clark Street
        Chicago, Illinois  60654
   BY: **DEBBIE L. BERMAN, ATTORNEY AT LAW**

Reported By:   Marla F. Knox, RPR, CRR, RMR
        Official Reporter

| | |
|---|---|
| 1 | **Thursday - May 13, 2021**                                    **1:57 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | **THE CLERK:** Calling Civil Action 20 -- excuse me -- |
| 5 | calling Civil Action 20-9203, Callahan, et al. versus |
| 6 | PeopleConnect, Inc., et al. |
| 7 | Counsel, please state your appearances for the record, |
| 8 | beginning with Counsel for the Plaintiffs. |
| 9 | **MR. OSBORN:** Benjamin Osborn for the Plaintiffs. Good |
| 10 | morning, Your Honor. Or good afternoon. |
| 11 | **THE COURT:** Good afternoon, Mr. Osborn. |
| 12 | **MR. RAM:** Good afternoon, Your Honor. Michael Ram, |
| 13 | also for the Plaintiffs. |
| 14 | **THE COURT:** All right. Thank you, Mr. Ram. |
| 15 | **MS. BERMAN:** Good afternoon, Your Honor. Debbie |
| 16 | Berman for Defendant PeopleConnect, Inc., the Delaware company. |
| 17 | **THE COURT:** All right. Thank you. Thank you, |
| 18 | Ms. Berman. |
| 19 | Let me ask, I'm sort of curious. The -- the registration |
| 20 | by Counsel on the two counts under John Doe and John Smith, |
| 21 | what was the purpose of that? |
| 22 | I mean, was that just to get additional information or is |
| 23 | there -- I'm trying to understand how that -- what the purpose |
| 24 | of that was. |
| 25 | **MR. OSBORN:** Yes, Your Honor. So I registered those |

1  accounts.  The purpose of registering those accounts was to
2  verify whether my clients' likenesses had, in fact, been taken
3  by Classmates and used to advertise their products.
4      So it was for the purpose of investigating this case and
5  indeed whether Plaintiffs had a claim or whether there were
6  sufficient facts to support filing a complaint here.
7          **THE COURT:**  And so without registering, you can't get
8  access to the actual --
9          **MR. OSBORN:**  That's correct.  I would not have been
10 able to include the screenshots and describe in detail what was
11 happening with Plaintiffs' likenesses and photographs in order
12 to file a complaint.
13     Furthermore, I will add that I attempted to opt out.
14 There is an opt-out clause provided in the terms of service
15 agreement.
16         **THE COURT:**  Yeah.
17         **MR. OSBORN:**  It requires that you send a letter to
18 Classmates.  However, Classmates responded by terminating the
19 account.
20     So it appears that the opt-out mechanism would have been
21 illusory anyway.
22     So I really do think it is impossible for me to have built
23 the facts in this case without creating those accounts.
24     And it was also impossible for me to opt out of the
25 arbitration clause.

1       **THE COURT:** All right. So I ask because it raises a
2  fundamental question. How can it be that an attorney's
3  investigation in an attempt to get necessary information to,
4  for instance, establish a cause of action, to prove standing,
5  et cetera, et cetera, suddenly binds the client to -- to
6  waiving their right to -- and access to the courts and to go
7  into arbitration?
8       Doesn't that, from a 40,000-foot level, implicate really
9  an access to the courts problem?
10      It is one thing when somebody signs on and they
11 themselves, even, perhaps, unwittingly, signs onto arbitration
12 where they just click and don't read.
13      But to be bound by what your counsel does in the course of
14 investigating -- unless there is consent.
15      I assume that the Plaintiffs will contend that they did
16 not consent to Mr. Osborn agreeing to terms of service and
17 agreeing to any arbitration clause?
18      **MR. OSBORN:** That's correct, Your Honor.
19      **THE COURT:** I'm making that assumption. If I'm wrong,
20 then maybe it is kind of a moot point.
21      If they did consent and you said: Hey, this is what
22 happens. You want me to click this thing? And they say yes,
23 then there is no question they have ratified and authorized it.
24      But here, there is a claim through the agency principle
25 that the attorney acting as agent for the client has,

1   unbeknownst to the client, bound that client to arbitration.
2       And doesn't that raise kind of fundamental questions,
3   Ms. Berman?
4           **MS. BERMAN:**  So, Your Honor, I think that the
5   Independent Living Resource Center case is on point.  And that
6   was the exact same argument that the Plaintiffs made there.
7       And this is a very narrow proposition.  They are not
8   talking about any action by any counsel at any time on a
9   website would bind their client.  This is directly related to
10  the claim.
11      And Mr. Osborn just made that very clear to Your Honor,
12  because he said that he went to check to see if they were in --
13  if they were there.
14      By doing that, he may be the only person who has ever
15  viewed their images and he has created the claim itself.
16      So it is directly tied to the claim that they now seek to
17  sue, and that's what the --
18          **THE COURT:**  Hold on.  I don't understand that
19  argument.  I don't understand that argument.
20      He is there to try to prove that -- that the image is on
21  there so others can look at it.
22      I don't know what you mean by -- you mean creating a claim
23  that would otherwise not exist or discovering the claim,
24  discovering proof of the claim?
25          **MS. BERMAN:**  Your Honor, there is no evidence in the

1  complaint, nothing pled, that anyone has ever viewed these
2  images other than Mr. Osborn.
3       And to have a right of publicity claim, someone actually
4  has to view them.  It can't just exist in theoretical
5  possibilities.
6       And the only evidence that we have is the evidence that
7  Mr. Osborn treated himself by going onto the website and
8  agreeing to the terms of service and to take the screenshots.
9       There is no other -- nothing else is pled in the complaint
10 that these images were ever viewed by anyone, ever seen by
11 anyone, ever used for any purpose.  And that is directly tied
12 to the very nature of their claims.
13            **THE COURT:**  So you are saying --
14            **MR. OSBORN:**  Your Honor --
15            **THE COURT:**  -- the complaint is predicated not on
16 discovering proof but the actual violation upon which the
17 complaint is predicated is the actual viewing by Mr. Osborn.
18 And but-for that, there would be no claim?
19            **MS. BERMAN:**  Well, Your Honor, I think for some of
20 them, for intrusion and seclusion, if the information is
21 ever -- which we don't think it's a valid claim anyway.
22      But if it is ever made public, then there is -- how can
23 there be an intrusion and seclusion, into the seclusion of the
24 Plaintiffs' information if it is never viewed by anyone?
25            **THE COURT:**  Let me ask Mr. Osborn.

1   Is there a place in the complaint where there is an
2 allegation that the members of the public -- member of the
3 public has viewed these pages that contains the likeness and
4 identity of your clients without their permission?
5           **MR. OSBORN:**  Your Honor, if I may, two responses.
6   First, that the core of our complaint is our Section 3344
7 claim, which is a right to publicity claim.
8   And the violation of the right to publicity arose from the
9 moment Classmates took the Plaintiffs' likeness -- took the
10 Plaintiffs' likenesses and incorporated it into their website
11 advertising and scheme designed to sell subscriptions to
12 classmates.com.
13   So in addition to -- our allegations in the complaint
14 state that the cause of action arises from that.
15   And so although the complaint does allege that people
16 viewed the photographs, separate from me, that is actually
17 irrelevant to the Section 3344 claim.
18   Admittedly, we don't know the facts.  We need discovery to
19 know whether people have actually viewed the Plaintiffs'
20 likenesses.
21   The fact that I discovered by creating the accounts was
22 that, yes, Classmates had gone out.  It had misappropriated
23 Plaintiffs' likenesses by copying it and placing it on its
24 for-payment website; and it was generating advertisements using
25 the Plaintiffs' likenesses that advertise both hard cover

1  reprints, yearbooks, and subscriptions to the website
2  classmates.com.
3  	So it was discovery -- that's what I was doing when I was
4  on the site -- not generating the actual cause of action as it
5  is -- as Ms. Berman contends.
6  		**THE COURT:**  Let me ask you --
7  		**MS. BERMAN:**  Your Honor --
8  		**THE COURT:**  Let me ask you this question, Ms. Berman.
9  	What you are essentially arguing is that the attorney has
10 waived the client's right to a judicial forum by clicking on --
11 in the course of their investigation by clicking on -- either
12 viewing or clicking on; correct?  That's -- that's the theory.
13 		**MS. BERMAN:**  Well, so, Your Honor --
14 		**THE COURT:**  Acting as agent; right?
15 		**MS. BERMAN:**  I'm sorry.  It's -- the Plaintiffs do not
16 dispute that Mr. Osborn went on the website; conducted a
17 search.
18 	There is -- Mr. Osborn's suggesting that somehow this
19 information just exists if you go onto classmates.com.
20 	I can assure you, Your Honor, if you go onto
21 classmates.com, you will not see images of their clients.
22 	They were generated because Mr. Osborn went on the
23 website.  He agreed to the terms of service, and he searched
24 for them.
25 	It is -- this is not like a website where you just type it

1  in and you see --
2       **THE COURT:**  Hold on, Ms. Berman.  I'm not talking
3  about the merits.  You are getting to the merits.  And you are
4  getting to whether or not there was proof of any violation.
5  I'm not there yet.
6       I'm at the beginning stages, which you have now teed up.
7  So I've asked you a very simple question.  I want to make sure
8  I understand your theory.
9       Your theory is that the clients are bound by arbitration
10 as a result of their attorney's investigation in which they
11 either use classmates.com or clicked on and created two
12 accounts; correct?
13      **MS. BERMAN:**  Yes.  Our position is that by Mr. Osborn
14 acting as an agent for his client, which they do not deny in
15 their opposition papers, going onto classmates.com; clicking on
16 terms of use and searching for his own clients, that that is
17 directly related to their cause of action, and it binds the
18 client under --
19      **THE COURT:**  Okay.  All right.  So let me ask you this
20 question:  This is a client being bound by an attorney's
21 action; right?
22      **MS. BERMAN:**  Yes, Your Honor.
23      **THE COURT:**  Do you know whether, under California law,
24 an attorney can bind the client to a decision -- there are
25 certain decisions only a client can make; right?

1   You cannot enter a settlement agreement without a client's
2   consent, for instance; correct?
3           **MS. BERMAN:**  Correct.
4           **THE COURT:**  You cannot dismiss a claim without your
5   client's consent; correct?
6           **MS. BERMAN:**  Correct, Your Honor.
7           **THE COURT:**  Can the -- can an attorney, under
8   California law, waive a client's right to go to court and agree
9   to arbitration without the client's consent?
10          **MS. BERMAN:**  I believe under the *Independent Living*
11  *Resource Center* case *versus Uber*, which was decided in 2019, it
12  was the very exact same issue.  And they said yes.
13          **THE COURT:**  Did the Court look at the question of
14  agency -- scope of agency between attorney and client?
15          **MS. BERMAN:**  They determined that it was -- that they
16  were acting as their agent.  And because they were acting as
17  their agent, they bound them.
18          **MR. OSBORN:**  Your Honor, may I respond to the *Uber*
19  case in particular?
20          **THE COURT:**  Yeah.  And if you know the answer to my
21  question -- it is a California scope of attorney power
22  question -- but go ahead.
23          **MR. OSBORN:**  I do not know the answer to your
24  question.  I can assure you that I had no discussions with my
25  clients regarding creating accounts.

1     And that's pled -- that's pled very clearly in our
2 position papers -- or not pled but stated clearly in our
3 opposition papers.
4     With respect to *Uber*, I think the primary distinction here
5 is that the claims in *Uber* arose from someone's use of that
6 application; right.
7     So the claims in *Uber* were seniors alleging that they were
8 receiving longer wait times for Uber rides than non-seniors
9 did.  And they filed a complaint saying:  Hey, we are getting
10 longer wait times.
11     And they said in the complaint:  Well, we don't actually
12 use Uber.  We just had a paralegal at the firm that was doing
13 our case get onto Uber and test whether, if that person were an
14 elderly client, they would have gotten longer wait times.
15     And the Court said:  Yes, there is an agency that exists
16 between the paralegal and the seniors who would have brought
17 the case.
18     There is language from the case talking about the fact
19 that the claims arose from use of the application.  Those
20 seniors don't even have a cause of action against Uber unless
21 they get on the app and they ask for a ride and they get a long
22 wait time.
23     Here, it is completely different.  My clients' claims
24 arose from the moment Classmates went out and copied their
25 photographs and put them on the website.

That's when the claims arose. And those claims existed; that theft occurred, independent of whether I ever got on the site or whether my clients ever got on the site and used Classmates.

**THE COURT:** Well, there is a case called *Blanton versus Womancare*, 38 Cal.3d 396, 1985, California Supreme Court case, holding that the attorney lacked authority to waive substantial rights of a Plaintiff by entering into a binding arbitration agreement, noting the Plaintiff did not consent to the agreement and did nothing beyond retention of the attorney to suggest that he had authority to enter into such an agreement and then repudiated the agreement as soon as she learned about it.

It held that the attorney, merely by virtue of his employment as such, has no apparent authority to bind the client to an agreement for arbitration.

That's just the summary. But that strongly indicates to me that -- and not surprisingly, this is one of those fundamental decisions that requires an attorney to -- the client to consent.

And if I'm right and that case so holds, then I don't see how the attorney in the course of doing some investigation, whether wittingly or unwittingly, ended up signing and being party to an arbitration agreement can bind the client without the client's consent. That's the problem I see here.

1   **MS. BERMAN:** So, Your Honor, I think that case is very
2   distinguishable in many aspects.
3   　　The case had already been pending.  And I believe in that
4   case, that the Plaintiff had told her lawyer that she would not
5   agree to binding arbitration; and he went ahead and did it
6   anyway.  When she found out, she fired him and got a new lawyer
7   and went to court.
8   　　That didn't happen here.  When we raised this argument,
9   there was no repudiation.  There was no firing of the lawyer.
10  There was no statements whatsoever.
11  　　Now, you may hear them now because you have represented
12  that case; but that is not what happened in this case.  And I
13  think that those facts are very different, and that's what was
14  motivating the Court in that case because the lawyer directly
15  violated direction from its client --
16  　　**THE COURT:** You think that case hinges on a directive
17  from the client not to engage in arbitration; and they did it
18  anyway, not on the principle of what is within the scope of an
19  attorney's power, vis-a-vis the client' power?  That is your
20  reading of the case?
21  　　**MS. BERMAN:** I think that is one of the distinctions.
22  　　I think another distinction is the waiver here happened
23  before the lawsuit was filed, not during the course of the
24  action.  And I think that changes the dynamics as well.
25  　　**THE COURT:** Why does that make a difference?

1 **MS. BERMAN:** Because it wasn't during -- it wasn't a
2 decision during the litigation as to whether it should proceed
3 in arbitration or in a lawsuit.  This was before that happened.
4 **THE COURT:** So this -- let me ask -- let me make sure
5 I have the sequence.
6 This -- going onto the website, when did it occur?
7 December 6th, 2020, before the lawsuit was filed; right?  Two
8 weeks before the lawsuit was filed.
9 So tell me again, how does that -- how does the timing
10 affect the scope of agency question?  I'm trying to understand
11 that.
12 **MS. BERMAN:** I think it was relevant in the *Blanton*
13 case that it was during the course of ongoing litigation that
14 the decision was made without permission.
15 That's not the facts in our case.  Neither one of those
16 facts existed.  It wasn't during the course of litigation, and
17 it wasn't -- it wasn't at the direct -- in direct contradiction
18 to what that client had ordered.
19 **THE COURT:** All right.  Mr. Osborn, your response, if
20 any.
21 **MR. OSBORN:** I'm -- on the particular point of the
22 *Blanton* case, I think the *Blanton* case is about the scope of
23 what is appropriate for an attorney to be able to waive on
24 behalf of the client.
25 Going back to Your Honor's points about when the

1  circumstances are that an attorney needs to get explicit
2  direction from the client in order to be able to waive their
3  rights, this feels very much like one of these circumstances.
4       I couldn't dismiss this claim without their permission;
5  nor could I have waived arbitration without their permission.
6       Furthermore, I will add two arguments, both of which
7  appear in our brief.
8       First, the terms of service itself that I clicked and
9  agreed to expressly provide that -- I'm not allowed to transfer
10 those rights to any third party.
11      The contract that Classmates drafted forbids that I should
12 be able to, as an agent, bind someone else.
13      So their own contract forbids the argument they are trying
14 to make here.
15           **THE COURT:**  Well, transferring a right is transferring
16 benefits.  That doesn't necessarily say who is bound and who is
17 not by the burdens.
18      I mean, I understand your argument.  I'm not sure there is
19 a perfect alignment there, but go on.
20           **MR. OSBORN:**  Sure.
21      It would be very surprising to me if I could transfer
22 one-half of that contract but not the other.  That would seem
23 unjust, but, perhaps, there is precedent for that kind of
24 application.  I'm not sure.
25      And the other -- the other point I would like to make is

1  that an -- in a case -- a recently decided case called *Lukis*
2  *versus White Pages* -- which is a case in which PeopleConnect
3  owns one of the defendants.  It is called Instant Checkmate --
4  has business practices very similar to Classmates.  This exact
5  same argument was advanced regarding arbitration.
6      Instant Checkmate argued that -- that the counsel's
7  investigation of the claim by visiting the website Instant
8  Checkmate led to -- led to the client being -- the Court
9  rejected that argument.
10     Now, rejected on grounds different than whether it is
11 possible or agency theory; but it did address the agency theory
12 argument and referred to it as dubious.
13     And the point the Court made there was that the claims had
14 arisen before the attorney ever visited the website, which is
15 exactly what it is here.
16     **MS. BERMAN:**  Your Honor, if I may.
17     Instant Checkmate is not a party to that case.  That is a
18 case against White Pages.  It was White Pages who is an entity
19 unrelated to any of my clients who brought that motion.
20     Judge Feinerman found that the arbitration claim be
21 dismissed, the motion to compel arbitration, because it had
22 been waived, because White Pages waited a year and a half to
23 bring that lawsuit.
24     And in that lawsuit, Mr. -- Judge Feinerman did not
25 find -- what Judge Feinerman said specifically was that the

1  alleged consent took place a year and a half after the lawsuit
2  had been pending, and that's what he found dubious.  Not -- he
3  did not, in anyplace in this case, say that it was dubious that
4  a lawyer could bind their client to a motion -- to an
5  arbitration agreement.  He said because --
6          **MR. OSBORN:**  Sorry.
7          **MS. BERMAN:**  -- it happened --
8          **THE COURT:**  Let her finish.  One at a time.
9          **MS. BERMAN:**  He said because -- that's what he says.
10 It was a year and a half into the litigation.  That's what he
11 finds dubious.
12     He challenged White Pages' dubious premise that Costales'
13 use of the website a year into the litigation to better
14 understand it.  That's all he says about that point.
15     The entire opinion, Your Honor, is devoted to waiver.  It
16 is entirely irrelevant.
17     We didn't wait a year and a half.  This is our first
18 responsive pleading in this case.  We promptly moved to compel
19 arbitration.  This case is not --
20         **THE COURT:**  Well, there is nobody arguing waiver on
21 that front here, so I understand.
22     You have a response briefly, Mr. Osborn.
23         **MR. OSBORN:**  Yes, very briefly.
24     Instant Checkmate is a Defendant in that case.  Ms. Berman
25 is correct, and I'm sorry I misstated that.

1    The White Pages was the Defendant who asserted the
2    argument in question here.
3    Nevertheless, White Pages' business practices are very
4    similar to those of Classmates.  And I would say is very clear,
5    based on those sentences that Ms. Berman just read, that the
6    word "dubious" refers to the premise, quote, of her counsel's
7    use of the website to better understand how it works and to
8    better represent her, subjects her right to publicity claims,
9    which, of course, are rare before the litigation commenced to
10   arbitration.
11   It is hard for me to read that sentence in a way other
12   than the Court found it dubious that the attorney who consented
13   to arbitration on the --
14   **THE COURT:**  All right.  Well, I have the cases.  I
15   will take a second look at that, and I will take the matter
16   under submission and rule accordingly.  So --
17   **MR. RAM:**  Your Honor, may I please add my two cents?
18   **THE COURT:**  Two cents.
19   **MR. RAM:**  Mr. Osborn mentioned at the beginning of the
20   hearing -- and it may have gotten lost -- that he opted out of
21   the arbitration clause pursuant to the provision in the
22   contract that allows one to opt out.
23   And that in response, the Defendant cancelled his
24   agreement.  So he did opt out of the arbitration provision,
25   Your Honor.

1	**THE COURT:** Is that alleged, that there was -- I mean,
2	the actual compliance with the opt-out procedure, sending a
3	letter, et cetera, et cetera?
4	**MR. OSBORN:** That is not alleged in -- I want to be
5	very clear.
6	So the accounts that I created to investigate, the ones
7	that I accessed in December before filing the complaint, I did
8	not follow the opt-out procedure for; and that opt-out
9	procedure was waived after 30 days.
10	So after Classmates raised its arbitration argument, I
11	created an additional account to test whether the opt-out
12	procedure actually is viable.
13	And that's where I have a record of me sending a letter,
14	and I have an e-mail I got back from Classmates saying we
15	terminated your account.
16	And I would be very happy to introduce a declaration to
17	that effect. I did not do so before this hearing because
18	with -- all of this happened yesterday, and I thought it would
19	be much to the Court's annoyance were I to file a declaration a
20	day before the hearing.
21	**THE COURT:** Well, I don't know if I need you to do
22	that. If I do, if I'm interested, I will let you know. But
23	right now I'm going to go with the record that we have.
24	All right. Thank you, Counsel. I will take it under
25	submission.

1            **MS. BERMAN:**  Thank you, Your Honor.

2            **THE COURT:**  Thank you.

3            **MR. OSBORN:**  Thank you.

4            **THE CLERK:**  Court is adjourned.

5                    (Proceedings adjourned at 2:19 p.m.)

6                              ---oOo---

7

8                      **<u>CERTIFICATE OF REPORTER</u>**

9            We certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11

12   DATE:   Wednesday, May 26, 2021

13

14

15

16   _____

17                 Marla F. Knox, RPR, CRR, RMR
                      U.S. Court Reporter
18

19

20

21

22

23

24

25